**STATE OF VERMONT**

**ENVIRONMENTAL COURT**

Secretary, Vermont Agency of
Natural Resources, Plaintiff,
}
}
v.                                         }        Docket No. 57-4-03 Vtec
}
}
Walter Southworth, Respondent.    }
}

Decision and Order

On April 10, 2003, the Secretary of the Vermont Agency of Natural Resources (ANR) issued an administrative order pursuant to 10 V.S.A. ' 8008 regarding Respondent Walter Southworth, who timely requested a hearing in Environmental Court. Respondent represented himself and the Secretary of the Agency of Natural Resources is represented by Catherine Gjessing, Esq.

The statutes, rules and permits applicable to this matter are 4 V.S.A. Chapter 27; 10 V.S.A. ' 1021(a); and 10 V.S.A. Chapter 201.

Findings

Respondent owns a parcel of land and a house adjacent to and in the floodplain of the Indian River to the south of Sawmill Road in West Pawlet, Vermont. At this location, the river drainage is more than ten square miles. Sawmill Road crosses the Indian River just downstream from (slightly to the north and east of) Respondent= s property.

In this area the Indian River and valley floor is characterized by coarse cobble stone and gravel material, so that the river is what is known as a > losing= stream, as opposed to an intermittent stream. That is, in dry weather the river continues to flow subsurface in the coarse gravel, even though the surface gravel in the streambed may be dry, as opposed to an intermittent stream that dries up entirely. The stream= s fish and invertebrates take refuge in pools and in the spaces between the subsurface gravel and cobbles.

The bed of the Indian River is > self-armoring;= that is, it is essentially paved by gravel and rocks carried by the action of the water during normal flow in up to a 22 -year flow event. The river bed is stable and resistant to erosion unless and until it is disturbed by heavy equipment (such as in the present case), or by a natural event such as an ice jam or a tree falling, or by the shear stress of a major flood.

In this area the Indian River flows to the northwest approaching Sawmill Road from the south, turns to the west and flows westerly along and to the south of the Sawmill Road embankment directly towards Respondent= s house, and then turns sharply to the north to flow under Sawmill Road at the bridge. Historically as of the 1960s the river narrowed at the Sawmill Road crossing, where the former bridge rested on abutments at the river banks, as seen in Respondent= s Exhibit B. In 1997 the old bridge had been replaced with a new bridge in connection with improvements made to Sawmill Road. Over time, both the bridge and Sawmill Road itself have also been raised, at least to the east of the bridge, creating a higher embankment that impounds the floodwaters to the east of Respondent= s property.

On December 19, 2000, a substantial flood, representing a ten-year flood event, occurred on the Indian River upstream from the Sawmill Road bridge[1], severely flooding Respondent= s property. Respondent had to prop up his house during the flooding.

More than six months later, at some time in the late summer or early fall of 2001 and before October 12, 2001, Appellant excavated an area approximately 3 feet deep by 25 feet wide by 100 feet long, representing 7500 cubic feet (278 cubic yards) of gravel from the then-dry stream bed. He did not remove it from the area, but placed it on the stream bank on his property. His purpose was to restore or reinforce the stream bank in front of his house, to protect his property and the residents in the event of another flood.

Unfortunately, the dredging of the stream channel and placement of gravel on the stream bank is entirely ineffective to protect Respondent= s house and property from another similar flood event. Excavation of the stream bed cannot create the volume needed to contain the floodwaters from such a flood. During such a flood, the whole valley is flooded to a depth of a few inches. An effective flood protection would be to raise Respondent= s house to an elevation above the level to be expected in such a flood.

Not only is the use of stream bed gravel ineffective to protect the stream bank at this location in the event of a serious flood, but removal of the gravel from the stream bed actually makes the stream bed unstable and more susceptible to greater erosion, putting the bridge abutments at risk. Moreover, Respondent= s removal of gravel destroyed habitat for fish spawning and for stream macroinvertebrates in the 100-foot-long section of the river that was disturbed.

As of the issuance of this administrative order in the spring of 2003, the stream bed was returning to its normal state and filling in the eroded locations. Although Respondent could have avoided the administrative order in the fall of 2001 by restoring the material excavated from the stream, by the spring of 2003 no additional remedial order was necessary to repair the damage done by the excavation of the material in 2001.

The cost of applying for a stream alteration permit in 2001 was $105. Neither party placed in evidence the cost per cubic yard of purchasing gravel, which would have been Respondent=s avoided cost (that is, as compared with as if Respondent had brought it in to the property from elsewhere). The State= s actual costs of enforcement were the time spent on enforcement by the enforcement officer and the environmental engineer. These costs amounted to $220[1] and $400[2], respectively, for a total of $620. The cost of replacing the removed material in the stream, which is the remedial action that would have avoided this administrative order, was estimated at approximately $200 for the equipment plus approximately four hours at $60 per hour, for a total of $440.

Conclusions as to Violation (10 V.S.A. ' 8012(c))(1)):

The statute requires this Court to determine whether a violation has occurred, 10 V.S.A. ' 8012(b)(1), independently of reviewing and determining anew a penalty amount. 10 V.S.A. ' 8012(b)(4).

Under 10 V.S.A. ' 1021, a permit is needed to excavate gravel from this stream at this location, as it has a drainage area of greater than ten square miles. A riparian landowner such as Respondent may excavate up to 50 cubic yards in a year without a permit, for use on the landowner= s own property, but is required to notify the Agency of Natural Resources at least 72 hours in advance of removing ten or more cubic yards. Section 1021(b) allows emergency protective measures necessary to preserve life or prevent severe imminent damage to property, but only if such measures are approved in advance by a member of the municipal legislative body and are reported to the Agency of Natural Resources within 72 hours after the onset of the emergency.

By removing approximately 278 cubic yards of material from the Indian River in West Pawlet in 2001, not during emergency conditions, and without applying for a permit or notifying the Agency in advance, Respondent violated 10 V.S.A. ' 1021.

Determination of Order and Penalty (10 V.S.A. ' 8012(c))(3)):

The Administrative Order against Respondent contains no remedial provisions. Paragraphs B and C of the Administrative Order merely restate the requirements of the law for any future actions by Respondent. Therefore, the Court must only review and determine anew an appropriate penalty amount for the violation by applying the eight criteria set forth in 10 V.S.A. ' 8010(b). 10 V.S.A. ' 8012(b)(4).

In the Administrative Order the Secretary imposed a penalty of $1,500 for the violation. In this proceeding the Secretary has requested a similar penalty.

First we must note that for a civil penalty to withstand constitutional scrutiny, it must be basically remedial in effect, rather than punitive. The methodology inherent in the statute and applied by this Court is to remove the economic benefit gained from the violation, in order to carry out the statutory purpose of preventing the unfair economic advantage obtained by persons who operate in violation of environmental laws, 10 V.S.A. ' 8001(2) and ' 8010(b)(5), and then to apply the remaining statutory factors to determine what additional penalty is needed, or whether mitigating factors should reduce any element of the penalty. That is, the entire economic benefit first must be removed to carry out a primary purpose of the Uniform Environmental Enforcement Act: to make it less expensive to comply with the law than to violate it.

We take each of the penalty factors in turn. The economic benefit to Respondent for the violations was only the avoided cost of the permit application plus the avoided cost of bringing in gravel or crushed rock from elsewhere, minus any expenditures he made on the actual gravel excavation. In the three years of 2001, 2002, and 2003, Respondent could have removed up to 50 cubic yards each year without incurring the cost of the permit application. However, as he removed more than that amount, he should incur the full cost of the avoided permit fee. As no evidence was presented on the avoided cost of bringing in gravel or crushed rock from elsewhere, or on Respondent= s expenditures, we cannot calculate any other economic benefit in this case.

The actual or potential environmental harm resulting to the Indian River and its fish and other aquatic biota was relatively minor and relatively short-term, as it involved only a 100-foot-long stretch of river which is restoring itself without further intervention. ' 8010(b)(1) and (b)(8).

We consider as a mitigating circumstance that the Town= s improvements to the road and bridge may have increased the risk of and extent of flooding on Respondent= s property. However, it is important to recognize that even if this is the case, it does not entitle Respondent to remove material from the stream except under emergency conditions, or in the amount of 50 cubic yards per year after notification to the Agency. The fact that the Secretary did not issue the administrative order against Respondent until a year and a half later is balanced, as a mitigating circumstance, against the Agency= s efforts to achieve voluntary compliance within that time, when Respondent knew the violation existed, even if he did not know it was a violation at the time the material was excavated. ' ' 8010(b)(2) and (3).

Respondent has no prior record of non-compliance. ' 8010(b)(4).

The Secretary showed actual costs of enforcement in the present case in the amount of $620. ' 8010(b)(7).

With regard to considerations of deterrence, Respondent= s lost expenditure of effort doing the excavation work, plus the lack of efficacy of that work at protecting his property from future flooding, and the probable need for him to make future expenditures to protect his property, combined with the cost of the present litigation, will have a sufficient deterrent effect so the only additional penalty beyond the components already discussed needed to achieve deterrence for the violation is to impose the cost of replacing the materials he removed from the stream, in the amount of $440, as the passage of time has made that remedial expenditure unnecessary. ' 8010(b)(6).

Accordingly, taking all these factors into account, the Court will impose a penalty for the violation of $1,165, calculated as $105 in removal of economic benefit, plus $620 in the state= s actual enforcement costs, plus $440 in the avoided remedial costs of replacing the illegally-removed gravel.

Based on the findings, conclusions, and reasoning of this decision, it is hereby ORDERED that:

Paragraph A of the April 10, 2003 Administrative Order is vacated. On or before February 15, 2003, Respondent shall pay a penalty of $1,165 for the violation to the State of Vermont, to be deposited in the general fund pursuant to 10 V.S.A. ' 8010(e). Respondent may discuss with the Agency of Natural Resources an alternate payment schedule; if any such schedule is agreed to, the parties may submit it to the Court as an agreed amendment to this order.

Paragraphs B and C of the April 10, 2003 Administrative Order merely state the requirements of the law, and are upheld as such.

Any party wishing a separate V.R.C.P. 58 judgment order may propose one for the Court= s signature so that it is received by the Court on or before December23, 2003; otherwise it will be deemed to have been provided by the above paragraphs modifying the Administrative Order, as required by 10 V.S.A. ' 8012(b).

Rights of Appeal (10 V.S.A. ' 8012(c))(4) and (5)):

**WARNING**: this decision will become final if no appeal is requested within **10** days of receipt of this decision. Respondent and the Secretary of the Agency of Natural Resources have a right to appeal this decision. The procedures for requesting an appeal are found in the Vermont Rules of Appellate Procedure (V.R.A.P.) subject to the exceptions in Vermont Rules of Civil Procedure (V.R.C.P.) 76(a)(3) and (d)(5). Within 10 days of receipt of this Order, any party seeking to file an appeal must file the notice of appeal with the Clerk of this Court, together with the applicable filing fee. Questions may be addressed to the Clerk of the Vermont Supreme Court, 111 State Street, Montpelier, VT 05609-0801, (802) 828-3276. An appeal to the Supreme Court operates as a stay of payment of a penalty, but does not stay any other aspect of an order issued by this Court. 10 V.S.A. ' 8013(d). A party may petition the Supreme Court for a stay under the provisions of V.R.C.P. 62 and V.R.A.P. 8.

Done at Barre, Vermont, this 11th day of December, 2003.

_____
Merideth Wright
Environmental Judge

---

## Footnotes

1. Respondent asserts that changes to the Sawmill Road and bridge, which resulted in raising the bridge and the roadway, and constricting the area under the bridge, exacerbated the flooding. This decision makes no findings as to the causation of the December, 2000, flooding of Respondent's property. But see footnote 3 at page 6 of this decision.

2. The environmental enforcement officer testified to $264 in time spent, but this was reduced in argument at the close of the hearing to $220.

3. The environmental engineer spent time on investigation, on negotiation with Respondent, and on testifying both as a fact witness and as an expert witness at trial. We have reduced the cost of his time to approximate the actual cost of enforcement, that is, his time spent on investigation and on preparation for and testifying at trial. We exclude the time spent on negotiation as not constituting an 'actual cost of enforcement' as provided in the statute, and so as not to create either an economic incentive or disincentive on the part of respondents or the Agency to engage in sometimes lengthy efforts at resolution of a violation.

4. It is possible that Respondent may have a cause of action for damages or for injunctive relief against the Town or the State, depending upon what changes occurred as a result of the road and bridge improvements. See, e.g., Canton v. Graniteville Fire Dist. No. 4, 171 Vt. 551 (2000); Powers v. Judd, 150 Vt. 290 (1988). However, those issues must be brought in superior court and are not before this Court for adjudication in this case.